OAO91 (Rev. 12/03) Criminal Complaint

# UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA
V.
LARRY W. CRITES
15 Beacon Street
Taunton, MA 02780

(Name and Address of Defendant)

## CRIMINAL COMPLAINT

Case Number: 1:07-M-3 M

I, the undersigned complainant state that the following is true and correct to the best of my knowledge and belief. On or about April 6, 2006 (Date) in Providence County, in the ______ District of Rhode Island defendant(s) did,

(Track Statutory Language of Offense)

travel in interstate commerce with the intent to carry on an unlawful activity, to wit,

extortion in violation of the Massachusetts extortion statute, Mass. Gen. Laws, ch 265, sec. 25

in violation of Title 18 United States Code, Section(s) 1952(a)(3).

I further state that I am a(n) Special Agent of the FBI (Official Title) and that this complaint is based on the following facts:

See attached Affidavit.

Continued on the attached sheet and made a part of this complaint: ☒ Yes ☐ No

Joseph R Degnan
Signature of Complainant

JOSEPH R. DEGNAN, Special Agent
Printed Name of Complainant

Sworn to before me and signed in my presence,

1-3-07 at Providence Rhode Island
Date City State

DAVID L. MARTIN U.S. Magistrate Judge David L Martin
Name of Judge Title of Judge Signature of Judge

1:07-M-3M

AFFIDAVIT

I, JOSEPH R. DEGNAN, sworn upon oath, do depose and say:

1. I am a Special Agent for the Federal Bureau of Investigation (FBI), United States Department of Justice, and have been so employed for over 19 years. I am currently assigned to the FBI office in Providence, Rhode Island.

2. This affidavit is submitted in support of a request for arrest warrants for Ricky Silva, born in 1959, of North Providence, Rhode Island, James G. Manning, born in 1943, of Cranston, Rhode Island, and Larry W. Crites, born in 1971, of Taunton, Massachusetts, for violation of 18 U.S.C. § 1952(a)(3) (traveling in interstate commerce with the intent to carry on an unlawful activity, to wit, extortion, in violation of Massachusetts General Laws ch. 265, § 25).

3. The facts and information contained in this Affidavit are based upon my own knowledge, gained in the course of this investigation, and on facts and information supplied to me by fellow FBI Special Agents and other members of law enforcement.

4. In the spring of 2006, I received information from a confidential informant, hereinafter referred to as Source 1, who has given information in the past leading to several federal convictions. Source 1 has an extensive criminal record for fraud and, on at least one occasion, has lied to the FBI and stolen money belonging to the FBI. However, Source 1's information has been corroborated by audio recordings, as further explained below.

5. Source 1 advised me that he, along with Ricky Silva, had been approached by Anthony St. Laurent, Sr. to collect money St. Laurent claimed was owed to him from two then unknown victims. It was clear, according to Source 1, that St. Laurent expected Source 1 and Silva to use physical force, if necessary, to collect said debts.

6. On April 4, 2006, at my direction, Source 1 drove to St. Laurent's home in Johnston, Rhode Island, to meet with St. Laurent. At approximately 12:30 PM, I observed Source 1 arrive at and enter St. Laurent's home, accompanied by a man whom I have identified from surveillance and information available to law enforcement as Ricky Silva. Source 1 was carrying a recording device which I had provided to him. I have listened to the recording. During the meeting, St. Laurent explained to Source 1 and Silva that on Thursday, April 6, 2006, they, along with a person St. Laurent identified as "Larry", were to attempt to collect money from "two guys". St. Laurent told Silva and Source 1 that if the two intended victims "don't go along with it, you give 'em a smack or something and tell him not to go to the cops or we're coming at you." St. Laurent stated that with respect to one of the intended victims, who he said owned a pizza shop, they should go into the pizza shop when it was closed. Otherwise, according to St. Laurent, they could be "pinched" by police afterwards. St. Laurent explained that he would fill them in on the details Thursday night,

April 6, 2006. St. Laurent stated that he knew where the other intended victim "buys Chinese food" and that "Larry knows everything", but he wasn't sure whether Silva and Source 1 would be able to find this intended victim. At approximately 12:37 PM, I observed Source 1 and Silva leave St. Laurent's home. At approximately 1:23 PM, I retrieved the recording device from Source 1, which had continued to operate without interruption since I had provided it to him.

7. On Thursday, April 6, 2006, at my direction, Source 1 again drove to St. Laurent's home in Johnston, Rhode Island, to meet with St. Laurent. At approximately 8:48 PM, I observed Source 1 arrive at and enter St. Laurent's home, accompanied by Silva. Source 1 was carrying a recording device, which I had provided to him. I have listened to the recording. During the meeting, St. Laurent introduced Silva and Source 1 to Manning. St. Laurent told Silva and Source 1 that one of the two men whom he wanted them to collect money from was named "Davey", and that they would "run into" "Davey" at a named bar. St. Laurent told Silva and Source 1 that "Larry, the guy you're gonna meet" knew "Davey". St. Laurent instructed: "You tell Davey . . . he's selling pills and booking . . . and you're going around . . . to everybody that ain't with nobody and you want a hundred g's ($100,000) and 2000 ($2000) a week." St. Laurent stated that if "Davey" didn't agree to their demands, then Silva and Source 1 had "to grab him again or you grab

him the first time . . . use your own discretion now." St. Laurent told Silva and Source 1 that with respect to "the guy in the pizza joint", the other intended victim, "you do the same thing." St. Laurent further stated that Silva and Source 1 needed "to try to get at least a g-note ($1000) a week or $2000 a week." Later during the meeting, St. Laurent told Silva and Source 1, "Maybe you have to shake them up, maybe, maybe not. Play it by ear, if the guy's not going to pay nothing you bash him." Manning warned Silva and Source 1 not to "do it in front of nobody." Silva later asked St. Laurent if he wanted them "to get something off them tonight." St. Laurent responded, "If you can." Silva asked St. Laurent what he thought was reasonable, and St. Laurent responded, "Half now and half next week." Later, St. Laurent told Silva, "Listen, if we take down a score, I'm gonna take some off the top for the old man." During my almost six years investigating organized crime in Rhode Island, I have spoken with numerous individuals who have had contact with members and associates of the New England La Cosa Nostra. These individuals have informed me that Luigi Manocchio is the head of New England La Cosa Nostra, They have also have informed me that Luigi Manocchio is commonly referred to as "the old man", and have themselves referred to Luigi Manocchio as "the old man".

8. During the meeting, Source 1 asked St. Laurent how he and Silva would know who "Larry" was. St. Laurent stated that at 10:00

PM, "Larry" would be in a bar, and that Manning would go into the bar and find him. Manning stated that he would "get [Larry] out, don't worry." St. Laurent told Silva and Source 1 that the bar was on Route 44, across from the Taunton Dog Track. Manning told Silva and Source 1 that "Larry" wanted to work for St. Laurent. St. Laurent stated that this meant "shaking down guys." Manning further described "Larry" as a "strong-arm guy."

9. St. Laurent instructed Silva and Source 1 to follow Manning on the way to meet "Larry", because Manning was "gonna come back." St. Laurent told Silva and Source 1 to "come back" on Route 495 (which runs only through Massachusetts, not Rhode Island).

10. At approximately 9:10 PM, I observed Source 1 and Silva leave St. Laurent's house, get into the same car that Source 1 had driven to the meeting, and travel from Rhode Island into Massachusetts via Route 44 East. Source 1 and Silva appeared to be following a white car bearing Rhode Island registration SD-811, later determined to be registered to Manning. I and several other members of law enforcement followed the two cars. At approximately 9:35 PM, I observed the two cars stop at a food-mart located on Route 44 in Dighton, Massachusetts. Source 1 and Silva got out of their car. The lone occupant of Rhode Island registration SD-811, a white male, got out of his car. From surveillance and other sources of information available to law enforcement, I have identified this man as James G. Manning. Source 1, Silva and

Manning had a conversation at the food-mart, outside their cars. Source 1 was still wearing the recording device I had given him prior to the meeting at St. Laurent's home; that device continued to operate without interruption. During the conversation, Manning told Silva and Source 1 that one of the intended victims, "David", was "a fucking punk" and that if they were to "grab him by the neck he'll fucking die, believe me." Manning stated that once they arrived at the bar he was leading them to, he would go in, find "Larry", and bring him out. Manning stated that "Larry" "wants to be with the fucking Saint the longest time. He wants to do strong-arm with him."

11. Following this conversation, I observed Manning drive to a bar located in Taunton, Massachusetts, followed by Source 1 and Silva in their car. At approximately 9:44 PM, I observed Manning enter this bar, while Source 1 and Silva waited outside. A few minutes later, I observed Manning come out of the bar, alone. I then observed Manning drive to the parking lot of a doughnut shop in Taunton, Massachusetts, followed by Source 1 and Silva in their car. I then observed Manning drive out of the parking lot, alone, returning a few minutes later, at approximately 10:01 PM, followed by a green Ford Expedition containing two men. The green Ford Expedition bore Massachusetts registration 4749PF. I have determined that that vehicle is registered in Massachusetts to Jessica A. Crites.

12. I observed the driver of the green Ford Expedition get out of that vehicle and speak with Source 1, Silva and Manning in the doughnut shop parking lot. Based on surveillance and other information available to law enforcement, I have identified the driver of the green Ford Expedition as Larry W. Crites. Source 1 was still wearing the recording device I had given him prior to the meeting at St. Laurent's home; that device continued to operate without interruption. During the conversation in the doughnut shop parking lot, Manning introduced Crites, whom he identified as "Larry", to Silva and Source 1. Manning stated that Crites was a friend of St. Laurent's. Silva asked what the game plan was. Crites confirmed that there were two guys they were supposed to be going to see, "Jimmy" and "Davey". Crites stated that to find "Davey", they needed to go to a named bar, which was located next to a Chinese restaurant in Raynham, Massachusetts. Manning stated that Crites had to go into the bar to locate "Davey" because Silva and Source 1 didn't know who he was. Crites agreed. Crites stated that the other intended victim, however, the "pizza guy", was "no fucking good." Manning asked Crites if the "pizza guy" was a "fucking rat." Crites stated that he was. Crites warned that although others had "shook" "the pizza guy" before and he had come up with the money, he believed that if confronted now, "the pizza guy" would not pay and, if given the chance, would report them to law enforcement. Later in the conversation, Crites suggested going

to the bar to attempt to locate "Davey". Manning asked if he could leave because he didn't "have to hear all this." Silva responded, "No, you can go if you want, Jimmy." Crites stated that with respect to "Davey", they should "smack him and grab him let's go and it's done. You're dealing with the Saint so you're paying now and that's it." During the conversation, Crites again cautioned against approaching the other intended victim, "the pizza guy". Silva responded, "All right. Let's go get the other guy," referring to "Davey".

13. At approximately 10:11 PM, I observed Crites get into the green Ford Expedition, and Source 1 and Silva get back into their car. Silva and Source 1 followed Crites and the green Ford Expedition out of the doughnut shop parking lot. Manning got into his car, and drove off in another direction.

14. At approximately 10:21 PM, I observed the green Ford Expedition and the car containing Source 1 and Silva pull into the parking lot of a named bar located in Raynham, Massachusetts. I then observed Silva, Source 1, Crites and the other occupant of the green Ford Expedition go into the bar. Source 1 was still wearing the recording device I had given him prior to the meeting at St. Laurent's home; that device continued to operate without interruption. Outside of the bar, Crites told Source 1 that "the word is" "Dave" was "moving tons of fucking oxy" ("oxy" is a street name for the Schedule II controlled substance oxycontin), and that

he "[doesn't] blame the Saint. He wants his fucking end and that's it."

15. At 10:44 PM, I observed Silva, Source 1, Crites and the other occupant of the green Ford Expedition come out of the bar, get into their respective vehicles, and drive out of the bar's parking lot. Subsequently, myself and other members of law enforcement lost contact with both vehicles. At 11:00 PM, I located the car in which Source 1 and Silva had been traveling parked, unoccupied, outside a named café/bar located in Taunton, Massachusetts. The green Ford Expedition was not there. Source 1 was still wearing the recording device I had given him prior to the meeting at St. Laurent's home; that device continued to operate without interruption. Silva, Crites and Source 1 continued to discuss "the pizza guy". Silva stated that "if I'm gonna scoop him the chances are he's gonna finger us later and it's not gonna happen. Crites responded, "He's going on vacation." Silva then stated, "Going on vacation in a horizontal position." Later, the men again discussed their concern that "the pizza guy" was in all likelihood going to call the cops on them. Silva stated, "Believe me, I have no problem scooping him and putting him in his backyard." Ultimately, the men again decided that confronting "the pizza guy" was not worth the risk of being apprehended by police. Crites suggested going to another named location because "Dave" could be there. Silva asked, "How is this guy, will he pay?"

Crites responded, "He's petrified." Source 1 told Crites to "stop and pick up our car on the way. We'll follow you."

16. At approximately 11:15 PM, I observed the green Ford Expedition and the car that Source 1 and Silva had been traveling in, both unoccupied, at a named business located in Taunton, Massachusetts. Source 1 was still wearing the recording device I had given him prior to his entering St. Laurent's home; that device continued to operate without interruption. Silva, Source 1 and Crites were together at this time, outside this business. Silva stated, "If this guy you say he'll pay, alright, the thing is we'll give him an ultimatum to make a payment. If he don't make a payment, we'll bang him." Crites stated that "this guy used to be with the Saint, and then said, go fuck yourself." Crites stated that he believed that "Dave" "was with the Saint," and "[n]ow I guess he's pushing a ton of fucking oxy and he doesn't want to kick up to anybody." Unsuccessful in their search for "Dave", the men discussed the next step. Source 1 stated, "We'll do some research tomorrow." Silva responded, "We'll find out what we're dealing with."

17. At approximately 11:50 PM, I observed Silva, Source 1, Crites and the other occupant of the green Ford Expedition come out of the business, get into their respective vehicles, and leave the parking lot, driving in different directions. At this time members of law enforcement broke off surveillance of both vehicles. At

approximately 12:35 AM on April 7, 2006, I met with Source 1 and retrieved the audio-recording device, which had continued to operate without interruption since I had first provided it to Source 1 at approximately 7:35 PM on April 6, 2006.

18. Based on the above, I submit there is probable cause to believe that Ricky Silva, James G. Manning and Larry W. Crites traveled in interstate commerce, and aided and abetted each other in such travel, with the intent to carry on an unlawful activity, that is, extortion in violation of the Massachusetts extortion statute, Mass. Gen. Laws ch. 265, § 25, in violation of 18 United States Code Section 1952(a)(3).

Joseph R. Degnan
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before
me this 3rd day of January, 2007
at Providence, Rhode Island

David L. Martin
United States Magistrate Judge